## UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAMES MOORE, Individually and on Behalf of All Others Similarly Situated, | **Case No.** |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| CHECKPOINT THERAPEUTICS, INC., JAMES F. OLIVIERO, and GARRETT GRAY, | |
| Defendants. | |

Plaintiff James Moore ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Checkpoint Therapeutics, Inc. ("Checkpoint" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Checkpoint securities between March 10, 2021 and December 15, 2023, both dates inclusive (the "Class Period"),

1

seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Checkpoint is a clinical-stage immunotherapy and targeted oncology company that focuses on the acquisition, development, and commercialization of novel treatments for patients with solid tumor cancers in the U.S. and internationally.  The Company relies on third-party contract manufacturers to, *inter alia*, conduct its preclinical and clinical studies and trials, as well as to complete commercial and pre-commercial manufacturing.

3.      Checkpoint's lead antibody product candidate is cosibelimab for the treatment of selected recurrent or metastatic cancers.  In January 2023, Checkpoint submitted a Biologics License Application ("BLA") to the U.S. Food and Drug Administration ("FDA") for the approval of cosibelimab as a treatment for patients with metastatic cutaneous squamous cell carcinoma ("cSCC") or locally advanced cSCC who are not candidates for curative surgery or radiation (the "cosibelimab BLA").

4.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Checkpoint had overstated its oversight of, and/or its establishment of adequate manufacturing standards and controls over, its third-party contract manufacturers; (ii) accordingly, there were one or more issues with the Company's third-party contract manufacturing organization ("CMO") for cosibelimab; (iii) all the foregoing reduced the likelihood that the FDA would approve the cosibelimab BLA in its present form; (iv) as a result, the manufacturing, regulatory, and commercial prospects of

cosibelimab were overstated; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

5.     On December 18, 2023, Checkpoint issued a press release disclosing that the FDA had not approved the cosibelimab BLA as a treatment for patients with metastatic or locally advanced cSCC who are not candidates for curative surgery or radiation.  In particular, the Company announced "that the [FDA] has issued a complete response letter ('CRL') for the cosibelimab [BLA] for the treatment of patients with metastatic or locally advanced [cSCC] who are not candidates for curative surgery or radiation."  The Company stated that "[t]he CRL . . . cites findings that arose during a multi-sponsor inspection of Checkpoint's third-party [CMO] as approvability issues to address in a resubmission."

6.     On this news, Checkpoint's stock price fell $1.49 per share, or 44.88%, to close at $1.83 per share on December 18, 2023.

7.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

8.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

10. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Checkpoint's common stock trades on the NASDAQ Capital Market ("NASDAQ"), which is located in this Judicial District.

11. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## **PARTIES**

12. Plaintiff, as set forth in the attached Certification, acquired Checkpoint securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

13. Defendant Checkpoint is a Delaware corporation with principal executive offices located at 95 Sawyer Road, Suite 110, Waltham, Massachusetts 02453. Checkpoint's common stock trades in an efficient market on the NASDAQ under the ticker symbol "CKPT".

14. Defendant James F. Oliviero ("Oliviero") has served as Checkpoint's President and Chief Executive Officer at all relevant times.

15. Defendant Garrett Gray ("Gray") has served as Checkpoint's Chief Financial Officer at all relevant times.

16. Defendants Oliviero and Gray are collectively referred to herein as the "Individual Defendants."

17. The Individual Defendants possessed the power and authority to control the contents of Checkpoint's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Checkpoint's SEC filings and press releases

alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Checkpoint, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

18.     Checkpoint and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

19.     Checkpoint is a clinical-stage immunotherapy and targeted oncology company that focuses on the acquisition, development, and commercialization of novel treatments for patients with solid tumor cancers in the U.S. and internationally.  The Company relies on third-party contract manufacturers to, *inter alia*, conduct its preclinical and clinical studies and trials, as well as to complete commercial and pre-commercial manufacturing.

20.     Checkpoint's lead antibody product candidate is cosibelimab for the treatment of selected recurrent or metastatic cancers, including metastatic cSCC and locally advanced cSCC.

### Materially False and Misleading Statements Issued During the Class Period

21.     The Class Period begins on March 10, 2021, the day after Checkpoint issued a press release during after-market hours, announcing the Company's full-year 2020 financial results and recent corporate highlights.  That press release stated, in relevant part:

- In January 2020, Checkpoint announced confirmation of the registration path for cosibelimab in mCSCC. FDA feedback supports the plan to submit a BLA based on data from the ongoing Phase 1 clinical trial.

* * *

- Also in November 2020, Checkpoint announced the expansion of a long-term manufacturing partnership for cosibelimab with Samsung Biologics. Building upon an existing contract manufacturing agreement entered into in 2017, Samsung Biologics will provide additional commercial-scale drug substance manufacturing for cosibelimab.

22.     The same press release quoted Defendant Oliviero, who stated, in relevant part:

We are very pleased with our momentum throughout 2020, solidifying the registration path for cosibelimab in metastatic [cSCC] ("mCSCC"), as well as announcing positive interim data from our pivotal Phase 1 program. Checkpoint's registration-enabling study in mCSCC is approximately 90% enrolled, with full enrollment anticipated shortly. We remain on track to report full top-line results in the second half of 2021. With a potentially favorable safety profile and plan to commercialize at a lower net price, we believe cosibelimab, if approved, has the potential to be a market disruptive product in the $25 billion and growing PD-(L)1 class. We look forward to a transformative year as we continue our progress towards our first BLA submission with the [FDA] for cosibelimab in 2022.

23.     On March 12, 2021, Checkpoint filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2020 (the "2020 10-K").  With respect to supply and manufacturing of the Company's product candidates, the 2020 10-K stated, in relevant part, that "[w]e have established, or intend to establish, contract manufacturing relationships for the supplies of our product candidates, in each case with a single manufacturer"; and that "we expect that we will rely on a single contract manufacturer to produce each of our product candidates under current GMP [good manufacturing practice] ('cGMP') regulations."

24.     In addition, the 2020 10-K represented that, notwithstanding Checkpoint's purported "little control over [third-party contract manufacturers'] compliance with [cGMP] regulations", the Company still maintained control over such compliance "through contractual

6

obligations" and is "required by law to establish adequate oversight and control over raw materials, components and finished products furnished by our third-party . . . contract manufacturers[.]"

25.    In a similar vein, the 2020 10-K stated, in relevant part:

The facilities used by our third-party manufacturers to manufacture our product candidates must be approved by the FDA pursuant to inspections that will be conducted after we submit a[] . . . BLA to the FDA. We are required by law to establish adequate oversight and control over raw materials, components and finished products furnished by our third-party manufacturers, but we do not control the day-to-day manufacturing operations of, and are dependent on, our third-party manufacturers for compliance with cGMP regulations for manufacture of our product candidates.

26.    Likewise, the 2020 10-K represented, in relevant part, that "[w]e are exposed to the risk of employee *fraud* or other misconduct" that "*could* include *intentional* failures to . . . comply with manufacturing standards we *have* established" (emphases added); thereby downplaying the risk of simple manufacturing negligence or other non-compliance, while simultaneously representing that Checkpoint had in fact established manufacturing standards for its third-party contract manufacturers.

27.    Appended as exhibits to the 2020 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein the Individual Defendants certified that the 2020 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by th[e 2020 10-K];" and that "the financial statements, and other financial information included in th[e 2020 10-K], fairly present in all material respects, the financial condition, results of operations and cash flows of [Checkpoint] as of, and for, the periods presented in" the 2020 10-K.

28.     On March 28, 2022, Checkpoint issued a press release announcing its full-year 2021 financial results and recent corporate highlights.   That press release quoted Defendant Oliviero, who stated, in relevant part:

> The past year represented a truly transformational period for Checkpoint Therapeutics, with the foundation laid for multiple significant potentially value enhancing catalysts in 2022. Following the positive topline results from our ongoing registrational trial of cosibelimab in metastatic [cSCC] announced earlier this year, we look forward to a planned [BLA] submission for cosibelimab later in 2022 . . . . We remain focused on expeditiously advancing our pipeline of product candidates with the goal of expanding patient access globally to potentially life-saving novel oncology therapies through a disruptive pricing strategy.

29.     Also on March 28, 2022, Checkpoint filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2021 (the "2021 10-K").   The 2021 10-K contained the same statements as referenced in ¶¶ 23-26, *supra*, regarding Checkpoint's legal obligations to establish adequate oversight and control over products provided by its third-party contract manufacturers, as well as the Company's control over these manufacturers' compliance with cGMP through contractual obligations and manufacturing standards that it had established, while downplaying the risk of simple manufacturing negligence or other non-compliance.

30.     Appended as exhibits to the 2021 10-K were substantively the same SOX certifications as referenced in ¶ 27, *supra*, signed by the Individual Defendants.

31.     On August 12, 2022, Checkpoint issued a press release announcing its second quarter 2022 financial results and recent corporate highlights.   That press release stated, in relevant part:

- In July 2022, Checkpoint **successfully completed two pre-BLA meetings with the FDA (chemistry, manufacturing and controls [CMC]** and clinical/non-clinical). Based upon **favorable** interactions with the agency, the planned BLA submission will include both the metastatic and locally advanced indications.

> Checkpoint also ***reached agreement with the FDA on all key aspects discussed with regard to the content of the upcoming BLA submission***.

(Emphases added.) (Alteration in original.)

32.    The same press release quoted Defendant Oliviero, who touted, in relevant part, that "[o]ver the past few months, we have made substantial progress towards the regulatory submission for, and potential approval of, cosibelimab for the treatment of [cSCC]"; and that, "[i]mportantly, we successfully completed our pre-BLA meetings with the FDA in July, reaching agreement on all key aspects discussed with regard to the upcoming BLA submission[.]"

33.    On November 8, 2022, Checkpoint issued a press release announcing its third quarter 2022 financial results and recent corporate updates.  That press release contained substantively the same statements as referenced in ¶ 31, *supra*, regarding Checkpoint's purported "successful" pre-BLA meetings with the FDA regarding, *inter alia*, chemistry, manufacturing, and controls for the cosibelimab BLA, as well as the Company's purported "favorable" interactions and agreement with the FDA on all key aspects discussed about the contents of that submission.

34.    On January 4, 2023, Checkpoint issued a press release "announc[ing] the submission of a [BLA] to the [FDA] for the approval of cosibelimab . . . as a treatment for patients with metastatic [cSCC] or locally advanced cSCC who are not candidates for curative surgery or radiation."  That press release stated, in relevant part, that "[t]he BLA submission is based on positive efficacy and safety results from Checkpoint's ongoing registration-enabling, multi-regional, multicohort clinical trial evaluating cosibelimab . . . in patients with selected recurrent or metastatic cancers"; and that "[b]ased upon interactions with the FDA, the BLA submission includes both the metastatic and locally advanced cSCC indications"; all of which overstated the cosibelimab BLA's regulatory prospects based on purported positive clinical results, while

simultaneously ignoring and/or downplaying the importance that third-party cGMP played in the cosibelimab BLA's submission.

35.    The same press release quoted Defendant Oliviero, who touted the cosibelimab BLA submission as "a major milestone for Checkpoint Therapeutics" and that, "[b]ased on its compelling and differentiated product profile and the positive data generated to date, we believe cosibelimab has the potential to be an important treatment option for patients."

36.    On March 2, 2023, Checkpoint issued a press release announcing that the FDA had accepted the cosibelimab BLA for filing, while touting that "[t]he FDA has set a Prescription Drug User Fee Act ('PDUFA') goal date of January 3, 2024" and that, "[i]n its BLA filing acceptance letter, the FDA indicated that ***no potential filing review issues have been identified***, and that an advisory committee meeting to discuss the application is not currently planned" (emphasis added).

37.    On March 30, 2023, Checkpoint issued a press release announcing its full-year 2022 financial results and recent corporate highlights.  That press release reiterated:

- Checkpoint submitted a BLA to the FDA seeking approval of cosibelimab in January 2023. In March 2023, the FDA accepted for filing the BLA for cosibelimab and set a PDUFA goal date of January 3, 2024. In its BLA filing acceptance letter, ***the FDA indicated that no potential filing review issues have been identified***, and that an advisory committee meeting to discuss the application is not currently planned.

* * *

- In July 2022, Checkpoint ***successfully completed two pre-BLA meetings with the FDA (chemistry, manufacturing and controls*** and clinical/non-clinical). Based upon ***favorable*** interactions with the agency, the January 2023 BLA submission included both the metastatic and locally advanced cSCC indications. Checkpoint also ***reached agreement with the FDA on all key aspects discussed regarding the content of the BLA submission***.

(Emphases added.)

38.     The same press release quoted Defendant Oliviero, who touted, in relevant part, that "[t]he past year was a momentous one for Checkpoint, and we began 2023 with the submission of our [BLA] to the [FDA] seeking approval of cosibelimab . . . as a treatment for patients with metastatic or locally advanced [cSCC] who are not candidates for curative surgery or radiation"; and that the "initial indication for cosibelimab represents a potential $1.6 billion U.S. market opportunity[.]"

39.     On March 31, 2023, Checkpoint filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2022 (the "2022 10-K").  The 2022 10-K contained the same statements as referenced in ¶¶ 23-26, *supra*, regarding Checkpoint's legal obligations to establish adequate oversight and control over products provided by its third-party contract manufacturers, as well as its control over these manufacturers' compliance with cGMP through contractual obligations and manufacturing standards that it had established, while downplaying the risk of simple manufacturing negligence or other non-compliance.

40.     Appended as exhibits to the 2022 10-K were substantively the same SOX certifications as referenced in ¶ 27, *supra*, signed by the Individual Defendants.

41.     On May 15, 2023, Checkpoint issued a press release announcing its first quarter 2023 financial results and recent corporate highlights.  That press release reiterated that, "[i]n its BLA filing acceptance letter, the FDA indicated that no potential filing review issues have been identified," while quoting Defendant Oliviero, who continued to tout, in relevant part:

> The first quarter of 2023 began a transformative year for Checkpoint, with our January submission of a [BLA] for cosibelimab in patients with metastatic or locally advanced [cSCC], followed by the FDA's acceptance of the BLA filing in March, ***in which they indicated that no potential filing review issues have been identified*** and that an advisory committee meeting to discuss the application is not

currently planned . . . . We continue to prepare for a potential commercial launch in 2024[.]

\* \* \*

If approved, based on its compelling efficacy and safety profile, we believe cosibelimab has the potential to capture significant market share in this $1.6 billion U.S. market opportunity[.]

(Emphasis added.)

42.     On August 14, 2023, Checkpoint issued a press release announcing its second quarter 2023 financial results and recent corporate highlights.  That press release quoted Defendant Oliviero, who stated, in relevant part:

We continue to work with the [FDA] toward the January 3, 2024 action date for our [BLA] for cosibelimab. ***Recently, our mid-cycle communication meeting with the FDA was successfully completed, and the FDA noted that no significant review issues . . . have been identified in their review to date[.]***

(Emphasis added.)

43.     On October 18, 2023—just two months before Checkpoint revealed that there were issues with its third-party CMO for cosibelimab—the Company issued a press release announcing the publication of additional positive data supporting cosibelimab's regulatory and commercial prospects for the treatment of patients with metastatic cSCC.  That press release quoted Defendant Oliviero, who stated, in relevant part, that "[w]e continue to work with the [FDA] toward the January 3, 2024, action date for our [BLA] for cosibelimab", while notably  failing to disclose what, if any, potential issues with manufacturing had been identified in connection with the cosibelimab BLA, much less the existence of, or plans for, a multi-sponsor inspection of Checkpoint's third-party CMO for cosibelimab.

44.     On November 13, 2023—approximately just one month before Checkpoint revealed that there were issues with its third-party CMO for cosibelimab—the Company issued a

press release announcing its third quarter 2023 financial results and recent corporate highlights. With respect to the cosibelimab BLA, that press release merely stated, in relevant part:

- Checkpoint submitted a BLA to the FDA seeking approval of cosibelimab in January 2023. In March 2023, Checkpoint announced the FDA accepted the BLA filing for cosibelimab and set a Prescription Drug User Fee Act ("PDUFA") goal date of January 3, 2024. The FDA has indicated that an advisory committee meeting to discuss the application is not planned.

These statements, too, failed to disclose what, if any, potential issues with manufacturing had been identified in connection with the cosibelimab BLA, much less the existence of, or plans for, a multi-sponsor inspection of Checkpoint's third-party CMO for cosibelimab.

45.     Similarly, in the same press release, with respect to the cosibelimab BLA, Defendant Oliviero merely stated that "[t]he January 3, 2024, action date for our [BLA] for cosibelimab is fast-approaching, and we continue to work closely with the [FDA] in completing their review"—again notably failing to disclose what, if any, potential issues with manufacturing had been identified in connection with the cosibelimab BLA, much less the existence of, or plans for, a multi-sponsor inspection of Checkpoint's third-party CMO for cosibelimab.

46.     The statements referenced in ¶¶ 21-45 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Checkpoint had overstated its oversight of, and/or its establishment of adequate manufacturing standards and controls over, its third-party contract manufacturers; (ii) accordingly, there were one or more issues with the Company's third-party CMO for cosibelimab; (iii) all the foregoing reduced the likelihood that the FDA would approve the cosibelimab BLA in its present form; (iv) as a result, the manufacturing, regulatory, and commercial prospects of cosibelimab were overstated; and (v) as

a result, the Company's public statements were materially false and misleading at all relevant times.

## The Truth Emerges

47.   On December 18, 2023, during pre-market hours, Checkpoint issued a press release disclosing that the FDA had not approved the cosibelimab BLA as a treatment for patients with metastatic or locally advanced cSCC who are not candidates for curative surgery or radiation, stating, in relevant part:

> [T]he [FDA] has issued a complete response letter ("CRL") for the cosibelimab [BLA] for the treatment of patients with metastatic or locally advanced [cSCC] who are not candidates for curative surgery or radiation. The CRL . . . cites findings that arose during a multi-sponsor inspection of Checkpoint's third-party [CMO] as approvability issues to address in a resubmission.
>
> * * *
>
> "As the only deficiencies relate to the FDA's inspection of our third-party [CMO], we believe we can address the feedback in a resubmission to enable marketing approval in 2024," said [Defendant] Oliviero, President and Chief Executive Officer of Checkpoint. "We are committed to working closely with our third-party manufacturer and the FDA on our resubmission in order to make cosibelimab available to patients living with cSCC."

48.   On this news, Checkpoint's stock price fell $1.49 per share, or 44.88%, to close at $1.83 per share on December 18, 2023.

49.   As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## SCIENTER ALLEGATIONS

50.   During the Class Period, Defendants had both the motive and opportunity to commit fraud.  They also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time.  In so doing,

Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

51.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the Company's securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

52.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Checkpoint securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Checkpoint or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

53.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

54.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

55.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Checkpoint;

- whether the Individual Defendants caused Checkpoint to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Checkpoint securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

56.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

57.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Checkpoint securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Checkpoint securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

58. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

59. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## <u>COUNT I</u>

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

60. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

61. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

62.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Checkpoint securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Checkpoint securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

63.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Checkpoint securities.  Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Checkpoint's finances and business prospects.

64.    By virtue of their positions at Checkpoint, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants

acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

65.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Checkpoint, the Individual Defendants had knowledge of the details of Checkpoint's internal affairs.

66.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Checkpoint's businesses, operations, and future financial condition and prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases, and public statements, the market price of Checkpoint securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Checkpoint's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Checkpoint securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

67.     During the Class Period, Checkpoint securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued, or caused to be disseminated, or relying upon the integrity of the market, purchased, or otherwise acquired shares of Checkpoint securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Checkpoint securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Checkpoint securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

68.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

69.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions, and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

70.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

71.     During the Class Period, the Individual Defendants participated in the operation and management of Checkpoint, and conducted and participated, directly and indirectly, in the conduct of Checkpoint's business affairs.  Because of their senior positions, they knew the adverse non-public information about Checkpoint's misstatement of income and expenses and false financial statements.

72.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Checkpoint's financial condition and results of operations, and to correct promptly any public statements issued by Checkpoint which had become materially false or misleading.

73.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Checkpoint disseminated in the marketplace during the Class Period concerning Checkpoint's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Checkpoint to engage in the wrongful acts complained of herein.  The Individual Defendants, therefore, were "controlling persons" of Checkpoint within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Checkpoint securities.

74.     Each of the Individual Defendants, therefore, acted as a controlling person of Checkpoint.  By reason of their senior management positions and/or being directors of Checkpoint, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Checkpoint to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Checkpoint and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

75.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Checkpoint.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: April 5, 2024                              Respectfully submitted,

                                                  POMERANTZ LLP

                                                  */s/ Jeremy A. Lieberman*
                                                  Jeremy A. Lieberman

J. Alexander Hood II
James M. LoPiano
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
ahood@pomlaw.com
jlopiano@pomlaw.com

*Attorneys for Plaintiff*