**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE CHECKPOINT THERAPEUTICS, INC. SECURITIES LITIGATION | Case No. 1:24-cv-02613-PAE <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT** <br><br> Honorable Paul A. Engelmayer |

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 1

II.     STATEMENT OF FACTS ................................................................................. 2

        A.    Checkpoint's Close Relationship With Its Manufacturer, Samsung
              Biologics ................................................................................................ 3

        B.    Checkpoint's Biologics License Application For FDA Approval Of
              Cosibelimab ........................................................................................... 3

        C.    The FDA Observed Numerous Violations Of Current Good Manufacturing
              Practices By Samsung Biologics, Including Severe Data Integrity Failures .......... 4

        D.    Checkpoint's Stock Plummeted When The FDA Rejected the Cosibelimab
              BLA Due To Samsung Biologics' Data Integrity Violations ................................ 4

III.    LEGAL STANDARDS ..................................................................................... 5

IV.     DEFENDANTS MADE MATERIALLY MISLEADING STATEMENTS ..................... 5

        A.    Oliviero's September 2023 Statements About The FDA's Review Of The
              Cosibelimab BLA Omitted The September 1, 2023 Form 483 ............................. 5

        B.    The November 2023 10-Q Statement Of Belief That The Form 483 Issues
              Would Be Promptly Resolved Omitted Adverse FDA Actions............................. 8

        C.    Defendants' Risk Factor Disclosures Misleadingly Portrayed Samsung's
              cGMP Non-Compliance As A Mere Hypothetical Possibility ............................. 9

        D.    Defendants' Misleading Statements And The Omitted Facts Were Material....... 11

V.      DEFENDANTS ACTED WITH SCIENTER ................................................... 12

        A.    Circumstantial Evidence Creates A Strong Inference That Defendants
              Immediately Knew About The September 1, 2023 Form 483 ............................. 13

              1.    Oliviero's Personal Involvement And Admission That Samsung
                    Biologics "Share Everything With Us" ....................................... 13

              2.    The Master Services Agreement .............................................. 14

              3.    Checkpoint's Oversight Of Samsung, In Accordance With Industry
                    Standard Practices............................................................. 15

              4.    Core Operations ................................................................ 16

              5.    Oliviero's Intentionally Evasive Response ............................... 17

           6.      The Competing Innocent Inference Is Implausible ................................... 18

    B.     FDA Actions In October 2023 Informed Defendants Of Even Greater Risks To Cosibelimab's Approval .................................................................................. 18

    C.     Samsung Biologics Had Notified Defendants Of Its Data Integrity Problems By At Least January 2023 ..................................................................................... 19

    D.     Defendants Were Consciously Reckless As To The FDA's Repeated Observations Of cGMP Violations At Samsung Biologics .................................. 19

    E.     Defendants Had Strong Financial Motives To Conceal Facts That Created Risks To Cosibelimab's Approval And Checkpoint's Stock Price ...................... 20

    F.     Defendants Seek To Impose A Scienter Standard That Is Contrary To Law ....... 22

VI.     DEFENDANTS' FRAUD CAUSED INVESTORS SUBSTANTIAL LOSSES ............. 23

VII.    OLIVIERO IS LIABLE AS CHECKPOINT'S CONTROL PERSON ........................... 24

VIII.   THE AHEARN EXPERT DECLARATION PROVIDES RELIABLE FACTUAL ALLEGATIONS AND SHOULD BE CONSIDERED BY THE COURT ...................... 25

IX.     CONCLUSION ............................................................................................................ 25

# TABLE OF AUTHORITIES

CASES

*Abramson v. Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020) .......................................................................................... 9

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ...................................................................................................... 5

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.*,
957 F. Supp. 2d 277 (S.D.N.Y. 2013) ........................................................................... 5

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005) ..................................................................................................... 23

*Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
794 F.3d 297 (2d Cir. 2015) .................................................................................... 5, 13

*Exch. Comm'n v. CKB168 Holdings, Ltd.*,
210 F. Supp. 3d 421 (E.D.N.Y. 2016) ......................................................................... 20

*Ganino v. Citizens Utilities Co.*,
228 F.3d 154 (2d Cir. 2000) ........................................................................................ 24

*Gillis v. QRX Pharma Ltd.*,
is misplaced. 197 F. Supp. 3d 557 (S.D.N.Y. 2016) .................................................. 22

*Goldman v. Belden*,
754 F.2d 1059 (2d Cir. 1985) ...................................................................................... 13

*Gorlamari v. Verrica Pharms., Inc.*,
2024 WL 150341 (E.D. Pa. Jan. 11, 2024) ........................................................... *passim*

*Hou Liu v. Intercept Pharms., Inc.*,
2020 WL 5441345 (S.D.N.Y. Sept. 9, 2020) .............................................................. 23

*In re Allergan PLC Sec. Litig.*,
2019 WL 4686445 (S.D.N.Y. Sept. 20, 2019) .............................................................. 8

*In re Aratana Therapeutics Inc. Sec. Litig.*,
315 F. Supp. 3d 737 (S.D.N.Y. 2018) ......................................................................... 22

*In re Braskem S.A. Sec. Litig.*,
246 F. Supp. 3d 731 (S.D.N.Y. 2017) .................................................................... 23, 24

*In re Delcath Sys., Inc. Sec. Litig.*,
  36 F. Supp. 3d 320 (S.D.N.Y. 2014) ................................................................................. 17

*In re Facebook, Inc. IPO Sec. and Deriv. Litig.*,
  986 F. Supp. 2d 487 (S.D.N.Y. 2013) ................................................................................ 9

*In re Intercept Pharms., Inc. Sec. Litig.*,
  2015 WL 915271 (S.D.N.Y. Mar. 4, 2015) ................................................................ 17, 22

*In re Platinum & Palladium Antitrust Litig.*,
  2017 WL 1169626 (S.D.N.Y. Mar. 28, 2017) .................................................................. 25

*In re Sanofi-Aventis Sec. Litig.*,
  774 F. Supp. 2d 549 (S.D.N.Y. 2011) ............................................................................ 5, 7

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001) ................................................................................................. 5

*In re SFBC Int'l, Inc. Sec. & Deriv. Litig.*,
  495 F. Supp. 2d 477 (D.N.J. 2007) .................................................................................... 7

*In re Tenaris S.A. Sec. Litig.*,
  493 F. Supp. 3d 143 (E.D.N.Y. 2020) ............................................................................... 9

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016) ............................................................................................... 5

*Iron Workers Loc. 580 Joint Funds v. Nvidia Corp.*,
  2020 WL 1244936 (N.D. Cal. Mar. 16, 2020) ................................................................. 25

*Liu v. Intercept Pharms., Inc.*,
  2022 WL 2165621 (2d Cir. June 16, 2022) ...................................................................... 23

*Makor Issues & Rts., Ltd. v. Tellabs Inc.*,
  513 F.3d 702 (7th Cir. 2008) ........................................................................................... 21

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) ...................................................................................................... 5, 11

*Meyer v. Jinkosolar Holdings Co.*,
  761 F.3d 245 (2d Cir. 2014) ..................................................................................... 5, 7, 9

*Mulligan v. Impax Lab'ys, Inc.*,
  36 F. Supp. 3d 942 (N.D. Cal. 2014) .......................................................................... 16, 23

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
   455 F. App'x 10 (2d Cir. 2011) ................................................................................... 16

*Nicosia v. Amazon.com, Inc.*,
   834 F.3d 220 (2d Cir. 2016)........................................................................................ 25

*Odeh v. Immunomedics, Inc.*
   2020 WL 4381924 (D.N.J. July 31, 2020).................................................... 10, 11, 12

*Oklahoma Police Pension Fund & Ret. Sys. v. Teligent, Inc.*,
   2020 WL 3268531 (S.D.N.Y. June 17, 2020) .............................................. 12, 14, 23

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015)....................................................................................................... 8

*Ong v. Chipotle Mexican Grill*, Inc.,
   294 F. Supp. 3d 199 (S.D.N.Y. 2018)......................................................................... 25

*Pub. Pension Fund Grp. v. KV Pharm. Co.*,
   679 F.3d 972 (8th Cir. 2012) ................................................................................. 7, 11

*Salzman v. ImmunityBio, Inc.*,
   2024 WL 3100274 (S.D. Cal. June 20, 2024)......................................... 7, 10, 15, 16

*Setzer v. Omega Healthcare Invs., Inc.*,
   968 F.3d 204 (2d Cir. 2020)................................................................................. 12, 23

*Shanawaz v. Intellipharmaceutics Int'l Inc.*,
   348 F. Supp. 3d 313 (S.D.N.Y. 2018)................................................................. 13, 20

*Sinnathurai v. Novavax, Inc.*,
   645 F. Supp. 3d 495 (D. Md. 2022)..................................................................... *passim*

*Skiadas v. Acer Therapeutics Inc.*,
   2020 WL 3268495 (S.D.N.Y. June 16, 2020) ..................................................... 20, 21

*Skiadas v. Acer Therapeutics Inc.*,
   2020 WL 4208442 (S.D.N.Y. July 21, 2020) ..................................................... 20, 22

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007)............................................................................................. 12, 13

*Todd v. STAAR Surgical Co.*,
   2016 WL 6699284 (C.D. Cal. Apr. 12, 2016) .................................................. *passim*

*Wheeler v. BRAC Int'l*,
  2024 WL 4416594 (S.D.N.Y. Oct. 3, 2024) ............................................................................ 25

*Wilkof v. Caraco Pharm. Lab'ys, Ltd.*,
  2010 WL 4184465 (E.D. Mich. Oct. 21, 2010) ........................................................................ 12

*Yanek v. Staar Surgical Co.*,
  388 F. Supp. 2d 1110 (C.D. Cal. 2005) ................................................................. 7, 13, 18, 22

RULES

Fed. R. Civ. P. 9(b) ............................................................................................................ 23

## I.   INTRODUCTION

Defendant James Oliviero is a sophisticated executive with substantial experience seeking FDA approval for new products in the biopharmaceutical industry. In his present role as CEO of Checkpoint Therapeutics, Inc. ("Checkpoint"),[1] he bet the company on its lead product candidate, cosibelimab, intended for treatment of certain skin cancers. In January 2023 Checkpoint submitted a Biologics License Application ("BLA") to the FDA for approval to market cosibelimab, with a decision expected in January 2024. The cosibelimab BLA, and any risks to its approval by the FDA, were of paramount importance to Checkpoint and its investors.

Checkpoint had fewer than 25 employees and no manufacturing facilities, so Oliviero hired Samsung Biologics to manufacture cosibelimab. To ensure the safety of biologic products FDA regulations require strict adherence to current Good Manufacturing Practices ("cGMP"). Defendants monitored Samsung's cGMP compliance and FDA interactions, and contractually required Samsung to timely provide copies of FDA communications relating to Checkpoint's products, expressly including any FDA Form 483. The FDA uses Form 483 to notify companies, after inspection of their facilities, of any conditions that may violate cGMP or other FDA regulations. On September 1, 2023, after the FDA completed a two-week inspection of Samsung relating to the cosibelimab BLA, the FDA issued a Form 483 noting several serious problems, first and foremost that Samsung "had inadequate controls over data integrity" such that "there is no means of determining with absolute certainty the true reliability of all test data."

Strong circumstantial evidence—Checkpoint's contract with Samsung, Checkpoint's personnel devoted to cGMP oversight, industry standard practices, Samsung's own practices, the

---

[1] Terms not otherwise defined herein have the same meanings as in the amended complaint (Dkt. 36) ("Complaint" or "¶__"). Defendants' motion to dismiss (Dkt. 38) is cited as "MTD." Unless noted, internal citations and quote marks are omitted and emphasis is added throughout this brief.

critical importance of the FDA inspection to Checkpoint's business, and Oliviero's own words—shows that Checkpoint and Oliviero promptly knew of the Form 483. As Oliviero later admitted, "the back and forth is between the FDA and this contract manufacturer though *they share everything with us*." Yet, when an analyst at a September 28, 2023 investor conference asked about communications with the FDA concerning the cosibelimab BLA, Oliviero replied:

> *Most recently*, we had our mid-cycle meeting with the FDA, whereby *they conveyed to us that there were no significant issues, no safety concerns thus far with the BLA review*, so very clean bill of health as of that point in time with the FDA. And now we've entered into the labeling discussion, part of the BLA process, so it's moving forward very nicely, and we're looking forward to hearing the results very soon.

Oliviero did not mention the Form 483, or *any* adverse information from the FDA. Only four days later, Checkpoint sold stock for $11 million, which it needed to be able to continue operating.

Oliviero's misleading statement was far from an isolated incident. In fact, he made nearly identical statements only two weeks earlier, showing that his omission of the Form 483 was intentional. Throughout the Class Period, Defendants selectively touted positive news about Samsung Biologics and their BLA, while concealing the FDA's repeated findings of serious cGMP violations at Samsung. On December 18, 2023 Checkpoint revealed that the FDA had rejected its cosibelimab BLA due to "findings that arose during a multi-sponsor inspection of Checkpoint's third-party contract manufacturing organization." Checkpoint's stock price fell by 44.9% that day. Defendants' fraud has caused substantial harm to investors. Their motion should be denied.

## II.    STATEMENT OF FACTS

During the Class Period Checkpoint was a small company with no products approved for sale by the FDA. ¶¶23-24. Checkpoint incurred roughly $50 million per year in operating expenses, which it could only fund by raising money from investors. ¶¶26-27. Checkpoint's prospects depended on near-term FDA approval for its lead product candidate, cosibelimab. ¶¶28-30. Oliviero has been Checkpoint's CEO and President since 2015. ¶20. He is the driving force behind

Checkpoint, managing its drug development programs and investor outreach, personally signing its SEC filings and major contracts, representing it at investor conferences, and directly participating in Checkpoint's interactions with the FDA. *E.g.*, ¶¶31, 109, 115, 139, 168-69.

### A.    Checkpoint's Close Relationship With Its Manufacturer, Samsung Biologics

Samsung Biologics is a contract manufacturing organization ("CMO"), which manufactures biological substances for drug owners. Checkpoint's relationship with Samsung is governed by a Master Service Agreement ("MSA") that became effective in 2017. ¶31; Dkt. 36-2 (MSA). Under the MSA, in October 2020 Checkpoint and Samsung executed a product specific agreement for the manufacture of cosibelimab. ¶33. In addition to Oliviero, at least eight other Checkpoint employees were involved in matters such as cGMP compliance and oversight of Samsung. ¶36. It is industry standard practice, and consistent with Samsung's own practices for other clients, for drug development companies and CMOs to collaborate closely on quality and compliance issues, in particular with regard to FDA inspections. ¶¶53-68; Dkt. 36-3.

### B.    Checkpoint's Biologics License Application For FDA Approval Of Cosibelimab

Throughout 2021-22 Defendants worked to prepare the cosibelimab BLA, and submitted it to the FDA in January 2023. ¶¶107, 117, 122, 127, 130-31. The FDA assigned a Prescription Drug User Fee Act ("PDUFA") goal date of January 3, 2024, for a decision to approve or deny the BLA. ¶¶8, 49, 131. The FDA met with Checkpoint and provided feedback several times leading up to and after the BLA's submission, and Defendants disclosed to investors uniformly positive information about these FDA interactions. ¶¶49-50, 122-23, 127, 130-32, 137, 141, 147-48. Among the many requirements for BLA approval, the FDA evaluates all manufacturing sites and conducts inspections if appropriate. ¶51. If a manufacturing site is found to have unacceptable cGMP violations, the FDA will withhold approval. ¶¶51-52. Data integrity is an important part of

3

cGMP, and has been a significant focus for the FDA in recent years. ¶¶38-47.

### C. The FDA Observed Numerous Violations Of Current Good Manufacturing Practices By Samsung Biologics, Including Severe Data Integrity Failures

The FDA conducted 11 inspections of Samsung Biologics during 2016-23, and each time issued a Form 483 noting significant cGMP violations. ¶¶71-81, 84. The FDA's February 28, 2023 Form 483 observed serious data integrity violations including that an employee "intentionally delet[ed]" certain information. ¶81. Subsequent reporting revealed that multiple Samsung Biologics executives, including the head of its Manufacturing Science and Technology ("MSAT") lab, were fired for having "deliberately engaged in . . . data falsification." ¶¶82-83; Dkt. 36-6.

From August 21 to September 1, 2023 the FDA inspected Samsung for the cosibelimab BLA. ¶84. On September 1, 2023 the FDA issued a Form 483 stating "[t]he [MSAT] laboratory used in support of application submission testing data had inadequate controls over data integrity" since 2013, "there is no means of determining with absolute certainty the true reliability of all test data," and that Samsung "failed to address laboratory deficiencies in a timely manner in assurance of data quality, data integrity used in regulatory submissions." Dkt. 36-4; ¶¶85-88. In October 2023, FDA inspectors recommended withholding BLA approval due to these issues. ¶¶89-90.

### D. Checkpoint's Stock Plummeted When The FDA Rejected the Cosibelimab BLA Due To Samsung Biologics' Data Integrity Violations

On December 18, 2023, Defendants announced that the FDA had issued a complete response letter ("CRL") rejecting the cosibelimab BLA. ¶151.[2] Though Defendants have withheld the CRL from public investors, they summarized that the rejection was due to inspection findings at Checkpoint's CMO. ¶¶151-52. On this news Checkpoint's stock price fell by 44.9%. ¶¶153-54.

---

[2] After the Class Period, on July 2, 2024, Checkpoint announced that it had resubmitted the cosibelimab BLA. On December 13, 2024 Checkpoint announced that the FDA approved the resubmitted BLA. By that time substantial harm was already done to Checkpoint's business due to the delay and expense of the resubmission, which was funded by large, dilutive stock sales.

## III.    LEGAL STANDARDS

A complaint need only "contain sufficient factual matter . . . to state a claim that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court "accept[s] all factual claims in the complaint as true and draw[s] all reasonable inferences in the plaintiff's favor." *Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015).[3] Even under the PSLRA, complaints do not need to plead "detailed evidentiary matter." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001). To state a claim under Exchange Act §10(b) and SEC Rule 10b-5(b), a plaintiff must allege: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011). Defendants contest only falsity, scienter, and loss causation. The Complaint sufficiently alleges each element.

## IV.    DEFENDANTS MADE MATERIALLY MISLEADING STATEMENTS

"[O]nce a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014). "[A] statement that contains only favorable matters and omits all reference to unfavorable matters is as much a false representation as if all the facts stated were untrue." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 240 (2d Cir. 2016). "Whether [the omitted fact] constitutes material information, and whether nondisclosure of the [omitted fact] renders the original disclosure misleading, remain questions for the trier of fact." *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 564 (S.D.N.Y. 2011).

### A.    Oliviero's September 2023 Statements About The FDA's Review Of The Cosibelimab BLA Omitted The September 1, 2023 Form 483

After the FDA completed its pre-approval inspection of Samsung Biologics for the

---

[3] The Court may take judicial notice of Defendants' exhibits, "but only to determine what the documents stated, and not to prove the truth of their contents." *City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 289 (S.D.N.Y. 2013) (Engelmayer, J.).

cosibelimab BLA and issued the September 1, 2023 Form 483 noting severe data integrity problems, Defendants concealed this information while misleadingly touting uniformly positive FDA feedback. At a September 11, 2023 investor conference Oliviero stated in prepared remarks:

> So, *with regard to the regulatory timeline, with regard to our BLA*, again, we submitted in January, it was accepted for filing in March. That's when we learned that there was no advisory committee meeting planned by the FDA. We were assigned that PDUFA goal date of January of 2024. *Most recently,* we announced that we completed our mid-cycle communication meeting with the FDA, whereby *the FDA communicated no significant review issues and no safety concerns identified to date*, so doing very well towards our approval. The late-cycle meeting is now scheduled for late October, and we look forward to moving through the rest of the process and having a successful PDUFA goal date in January.

¶137; Dkt. 39-9. At another investor conference on September 28, 2023, an analyst asked, "the PDUFA date [is] coming up in just a couple of months. Maybe recap the kinds of discussions you've had with the FDA and communications and what steps are left between now and that date?"

¶140; Dkt. 39-10. Oliviero replied, echoing his September 11, 2023 statements:

> Sure. So it was a very typical process for a full BLA review. We filed or submitted the BLA back in January of this year 2023. It was accepted for filing, which is when we found out that the FDA was not planning an advisory committee meeting. We then progressed through the review. Again a very typical review. *Most recently*, we had our mid-cycle meeting with the FDA, whereby *they conveyed to us that there were no significant issues, no safety concerns thus far with the BLA review*, so very clean bill of health as of that point in time with the FDA. And now we've entered into the labeling discussion, part of the BLA process, so it's moving forward very nicely, and we're looking forward to hearing the results very soon.

¶141. On neither occasion did Oliviero disclose the September 1, 2023 Form 483 or its findings.

By only discussing positive facts while omitting that the FDA's recent inspection of Samsung found data integrity problems so severe that the FDA could not determine the reliability of its test data (¶¶85-88), Oliviero created a highly misleading impression. *See Todd v. STAAR Surgical Co.*, 2016 WL 6699284, at *6 and *10 (C.D. Cal. Apr. 12, 2016) (statements about progress toward FDA approval that omitted Form 483 were misleading). "Form 483s are issued

6

. . . to notify a company's 'top management in writing of *significant objectionable conditions*'." *Pub. Pension Fund Grp. v. KV Pharm. Co.*, 679 F.3d 972, 976 (8th Cir. 2012) (quoting FDA Investigations Operations Manual, Ch. 5, § 5.2.3 (2009)). Accordingly, courts have repeatedly found actionable omissions where a drug owner conceals cGMP violations noted in a Form 483 issued to its contract manufacturer. *See Salzman v. ImmunityBio, Inc.*, 2024 WL 3100274, at *9 (S.D. Cal. June 20, 2024); *Gorlamari v. Verrica Pharms., Inc.*, 2024 WL 150341, at *8 (E.D. Pa. Jan. 11, 2024); *Sinnathurai v. Novavax, Inc.*, 645 F. Supp. 3d 495, 520 (D. Md. 2022).

Defendants argue they had no independent duty to disclose the September 1, 2023 Form 483 (MTD at 18-19), but it is well established that "once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Jinkosolar*, 761 F.3d at 250; *e.g.*, *Novavax*, 645 F. Supp. 3d at 520 ("where [defendant] chose to speak about the timeline for regulatory approval" failure to disclose manufacturing problems was actionably misleading); *Sanofi-Aventis*, 774 F. Supp. 2d at 563 (where defendants were "regularly commenting about a pending drug application," they had "an unwaivable duty to be both accurate and complete when [they] spoke to investors.").

Oliviero's statements were also misleading because, in response to the question about "what steps are left between now and" the (January 3, 2024) goal date for the FDA's decision, the only task he mentioned was "the labeling discussion," *i.e.* negotiations over the contents of cosibelimab's label. ¶¶140-41. *See Yanek v. Staar Surgical Co.*, 388 F. Supp. 2d 1110, 1131 (C.D. Cal. 2005) ( "[t]he main element remaining with FDA is the labeling discussion" was misleading due to omission of Form 483). Recipients of Form 483 are required to respond to the FDA and to implement corrective actions. ¶57; *In re SFBC Int'l, Inc. Sec. & Deriv. Litig.*, 495 F. Supp. 2d 477, 481 (D.N.J. 2007) ("corrective action by the inspected company is expected. Indeed, an establishment may face legal sanctions . . . if it does not voluntarily correct serious conditions").

7

As Defendants stated on November 13, 2023, even then Samsung still needed to "respond to and address the observations." ¶144. It was misleading to mention only the labelling discussion (which indicated progress toward approval) while omitting Samsung's *unresolved* data integrity problems.

Oliviero's statements were still further misleading because he implied the FDA's positive mid-cycle meeting communications were the FDA's "[m]ost recent[]" action on the cosibelimab BLA, but that meeting occurred by August 14, 2023 (¶162), weeks before the FDA issued the Form 483. That the FDA had "most recently" identified Samsung's major data integrity violations significantly changed cosibelimab's approval prospects for the worse.[4]

### B.    The November 2023 10-Q Statement Of Belief That The Form 483 Issues Would Be Promptly Resolved Omitted Adverse FDA Actions

Checkpoint filed its SEC Form 10-Q for the third quarter of 2023, signed by Oliviero, on November 13, 2023. ¶143. Defendants disclosed the existence of a Form 483 for the first time, while omitting its findings and downplaying its importance:

> Our contract manufacturer for cosibelimab has received certain observations from the FDA on Form 483 related to a recent multi-sponsor on-site inspection. While *we believe the manufacturer will adequately respond to and address the observations during our BLA review timeline*, there is no guarantee that the FDA will agree with the response and remediations in a timely manner or at all, which could negatively impact our ability to obtain regulatory approval for cosibelimab or obtain approval within projected timelines.

¶144. Such a statement of opinion that "omits material facts about the issuer's . . . knowledge" which "conflict with what a reasonable investor would take from the statement itself," is actionably misleading. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 189 (2015); *id.* at 188-89 ("the investor . . . expects not just that the issuer believes the opinion

---

[4] Even if Oliviero's hedges of "identified to date," "thus far," or "as of that point in time" (¶¶137, 141), made his statements *literally* true (they did not), they would still be materially misleading for omitting the September 1, 2023 Form 483. *See In re Allergan PLC Sec. Litig.*, 2019 WL 4686445, at *23 (S.D.N.Y. Sept. 20, 2019) ("[E]ven a statement that is literally true when viewed in isolation can be misleading in context if it leaves investors with a false impression.").

(however irrationally), but that it fairly aligns with the information in the issuer's possession"). And while Defendants did not "guarantee" approval of cosibelimab, guarantees are not required for a statement to be actionably misleading. *See Jinkosolar*, 761 F.3d at 251.

A reasonable investor would take from Defendants' professed belief that Samsung would fix its violations within the review timeline that Defendants did not have reason to believe those violations posed heightened risks to the BLA's approval. But two FDA inspectors had already classified the pre-approval inspection of Samsung at the highest level of non-compliance—Official Action Indicated—and had issued recommendations to withhold BLA approval. ¶¶89-90. And the FDA had already rejected Eli Lilly's lebrikizumab BLA due to the *same issues* discovered at the inspection. ¶¶92-96. These facts severely undermined the prospects for near-term approval of cosibelimab, and did not fairly align with Defendants' statement. *See Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 178 (2d Cir. 2020) (opinion statement about defendant's drug study was misleading because undermined by data from other studies).

### C.    Defendants' Risk Factor Disclosures Misleadingly Portrayed Samsung's cGMP Non-Compliance As A Mere Hypothetical Possibility

In March 2021, March 2022 (¶120), and March 2023 (¶135), Defendants stated "*[i]f we, or our contract manufacturers, fail to comply* [with cGMP], then the FDA may not allow us to market products." ¶110. Similarly, "*[i]f* [third-party manufacturers] *are deemed out of compliance with cGMPs* . . . supplies could be delayed." ¶111. And likewise, "[t]hird-party manufacturers *may not be able to comply with the cGMP regulations*." ¶112. As such, Checkpoint's "risk warnings misleadingly . . . only warned what might occur if certain contingencies were met; the disclosures did not make clear that such contingencies had, in fact, already occurred." *In re Facebook, Inc. IPO Sec. and Deriv. Litig.* 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013); *see also In re Tenaris S.A. Sec. Litig.*, 493 F. Supp. 3d 143 (E.D.N.Y. 2020) (similar).

In March 2021, Samsung had been inspected seven times since 2016, each time receiving a Form 483. ¶114. Those Form 483s contained 33 observations, including serious failures such as "[l]aboratory controls used to release [redacted] drug substance do not include scientifically sound and appropriate test procedures that assure conformance to appropriate standards of quality and purity" (¶73), and "[p]rocedures to prevent microbial contamination of drug products purporting to be sterile are not followed" (¶75). ¶¶71-78. Prior to March 2022, the FDA again inspected Samsung and issued another Form 483, noting additional violations. ¶¶79, 120. The FDA issued two more Form 483s prior to March 2023, on February 28, 2023 identifying significant data integrity problems including a Samsung analyst "intentionally deleting" information. ¶¶80-81. By January 2023, Samsung also notified clients of its data integrity violations including, *inter alia*, "sticky notes with system password written on PCs, use of shared administration account . . . uncontrolled spreadsheets used to track samples, [and] use of uncontrolled sheets to document test results." ¶¶87, 91. These were serious cGMP violations because Samsung "store[d] electronic records in a manner that allows for manipulation without creating a permanent record." ¶¶43, 45.

In light of these facts, "Defendants' risk-factor statements are . . . materially misleading because Defendants presented the prospect of . . . cGMP deficiencies as purely hypothetical when they had already occurred." *See ImmunityBio*, 2024 WL 3100274, at *10. Similarly, in *Odeh v. Immunomedics, Inc.* the company learned of a "data integrity breach" where its personnel misrepresented test procedures and backdated records. 2020 WL 4381924, at *3 (D.N.J. July 31, 2020). Immunomedics filed a BLA, and after inspecting its facility the FDA issued a Form 483 noting it "could make no assessment whether the Data Integrity Breach had been remediated." *Id.* at *3-4. Immunomedics then issued risk disclosures stating "[o]ur Information Systems *may* be subject to . . . security breaches." *Id.* at *3. That statement was misleading because it "framed a

10

data breach as a potential risk when such a risk had already materialized." *Id.* at *6.

      **D.**      **Defendants' Misleading Statements And The Omitted Facts Were Material**

Materiality "is satisfied when there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Matrixx Initiatives*, 563 U.S. at 38. This is "an inherently fact-specific" inquiry. *Id.* at 39. Cosibelimab was Checkpoint's lead product candidate and only product close to potential approval, and Checkpoint incurred large losses and had little cash. ¶¶23-30. Whether the FDA would approve the cosibelimab BLA without requiring a time-consuming, expensive, and uncertain resubmission was highly important to Checkpoint and its investors. *See Todd*, 2016 WL 6699284, at *10 ("STAAR's business requires prompt FDA approval of its products, and any facts indicating delay of such approval are crucial to the investors").

As the manufacturer for cosibelimab, if the FDA found Samsung to have unacceptable cGMP violations this could result in the rejection of the BLA, so any FDA observations relating to Samsung's compliance or lack thereof were similarly important. *See Verrica Pharms.*, 2024 WL 150341, at *9 (materiality alleged where "VP-102 was [defendant]'s biggest product . . . and [FDA] approval could not be obtained if [defendant's CMO] was not in cGMP compliance"); *Novavax*, 645 F. Supp. 3d at 520 (disclosure of manufacturing problems "would have significantly altered the total mix of information available to a reasonable investor because such an investor would have understood that Novavax's ability to obtain regulatory approval . . . was in jeopardy.").

Courts have repeatedly found Forms 483 to be material, based on factors including "the number, severity, and pervasiveness of objectionable conditions noted, as well as whether a company has failed to address or correct the deficiencies noted by the FDA." *KV Pharm.*, 679 F.3d at 983. Here, for example, the September 1, 2023 Form 483 was material because it contained six observations, noted pervasive data integrity problems existing since 2013 that were so severe that

11

"there is no means of determining with absolute certainty the true reliability of all test data," and noted that Samsung Biologics "failed to address laboratory deficiencies in a timely manner." ¶¶84-88; *see Immunomedics*, 2020 WL 4381924, at *6-7 ("a reasonable shareholder could consider the omitted information about the Data Integrity Breach and the Form 483 to be important when making an investment decision"). At the very least, "[t]he existence of the . . . 483 Letter is not so 'obviously unimportant' that reasonable minds could not differ." *Oklahoma Police Pension Fund & Ret. Sys. v. Teligent, Inc.*, 2020 WL 3268531, at *15 (S.D.N.Y. June 17, 2020).

Defendants argue that certain statements were puffery, by quoting isolated excerpts that ignore their context. But materiality and puffery are fact- and context-dependent. Defendants quote the fragment "[d]oing very well towards approval" (MTD at 19) from ¶137, while omitting Oliviero's detailed statements about positive FDA communications that failed to disclose the September 1, 2023 Form 483. His statements of objectively verifiable and presently existing fact regarding the FDA's review of the cosibelimab BLA were *not* puffery. *See Teligent*, 2020 WL 3268531, at *10 ("statements are not puffery when they constitute misrepresentations of existing facts"); *Wilkof v. Caraco Pharm. Lab'ys, Ltd.*, 2010 WL 4184465, at *4 (E.D. Mich. Oct. 21, 2010) (objective facts such as "whether Caraco was compliant with cGMP regulations" are not puffery).

## V.    DEFENDANTS ACTED WITH SCIENTER

Plaintiffs may plead a strong inference of scienter by "alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 212 (2d Cir. 2020). Courts consider "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322-23 (2007). Scienter allegations need not be "irrefutable" or "of the 'smoking-gun' genre."

12

*Id.* at 324; *see also Blanford*, 794 F.3d at 297 (the scienter standard "[w]hile robust . . . does not involve applying the more probing test used at the summary judgment . . . as the court is unaided by discovery at the motion to dismiss stage"). Here, Plaintiffs' mutually reinforcing allegations of conscious recklessness and motive create a strong inference of Defendants' scienter.

### A. Circumstantial Evidence Creates A Strong Inference That Defendants Immediately Knew About The September 1, 2023 Form 483

Strong circumstantial evidence shows that Defendants immediately, or at the very least before Oliviero's September 11 and 28, 2023 statements, learned of the September 1, 2023 Form 483. Therefore, there is a strong inference of Oliviero's conscious recklessness because he "knew facts or had access to information suggesting that [his] public statements were not accurate." *Blanford*, 794 F.3d at 306; *e.g.*, *Yanek*, 388 F. Supp. 2d at 1130-31 (strong inference of scienter where defendant knew of but concealed Form 483 that created risks to product's approval).

### 1. Oliviero's Personal Involvement And Admission That Samsung Biologics "Share Everything With Us"

That defendants are directly involved in and knowledgeable about the subject of an alleged fraud supports an inference of their scienter. *See Goldman v. Belden*, 754 F.2d 1059, 1070 (2d Cir. 1985) ("defendants portrayed themselves in their public statements during the class period as persons highly knowledgeable about the industry"); *Shanawaz v. Intellipharmaceutics Int'l Inc.*, 348 F. Supp. 3d 313, 326 (S.D.N.Y. 2018) (where defendants often spoke about drug application and were involved in its development, "they also can be presumed to have known [its] contents").

Oliviero has nearly 25 years of experience in the biotechnology industry, including overseeing regulatory affairs. ¶20; *see Todd*, 2016 WL 6699284, at *12–13 (executive's "long history managing FDA regulated companies" and "comprehensive understanding of FDA procedures" contributed to strong inference of scienter). Oliviero was deeply involved with the cosibelimab BLA—all correspondence from the FDA to Checkpoint regarding the BLA was to be

13

sent directly to Oliviero (¶169), he attended the FDA's inspection of Checkpoint's headquarters (*id.*), and in detailed public statements he frequently discussed the BLA and related FDA communications (¶¶107, 117, 121-23, 127, 129-32, 137, 141, 143-44, 146-48, 152, 157,-58). *See Teligent*, 2020 WL 3268531, at *18 (defendant's interactions with FDA supported scienter).

Oliviero was likewise deeply involved in Checkpoint's relationship with Samsung, signing the MSA (¶31), announcing the product specific agreement to manufacture cosibelimab (¶170), and repeatedly discussing Samsung in his public statements (¶¶105-06, 117, 127, 143-44, 152, 157-58). When Oliviero was asked about Checkpoint's CMO and the FDA's rejection of the BLA, he gave a reply showing his detailed knowledge, and stated "the back and forth is between the FDA and this contract manufacturer though *they share everything with us*." ¶¶156-57. Oliviero's admission, combined with his direct and substantial involvement with Samsung and the BLA, give rise to a strong inference that he promptly knew of the September 1, 2023 Form 483.

### 2.     The Master Services Agreement

The MSA provides, *inter alia*, that "[Samsung] shall notify [Checkpoint] . . . of any contacts or inquiries by the Regulatory Authorities, including inspections, Pre-Approval Inspections, . . . and written correspondence . . . related to" Checkpoint's products. ¶32; Dkt. 36-2 at § 7.3. "[Checkpoint] shall be entitled to witness any inspection or audit by a Regulatory Authority of the Facility" related to Checkpoint's products, and "[Checkpoint] shall be entitled to attend, as an observer, any wrap-up meeting between [Samsung] and a Regulatory Authority related to such an inspection." *Id.* And, "[Samsung] *shall timely provide [Checkpoint] with a copy of any Form 483*, inspection report or regulatory letter . . . and shall provide [Checkpoint] a meaningful opportunity to review and comment upon any response of [Samsung] thereto." *Id.*

By far the strongest inference is that Samsung complied with these important contractual provisions, and promptly notified Checkpoint of the pre-approval inspection and Form 483. *See*

*Novavax*, 645 F. Supp. 3d at 526 (requirement for CMO to notify defendant company of adverse FDA inspection findings contributed to scienter); *ImmunityBio*, 2024 WL 3100274, at *2 (that defendants learned "through their quality agreement with [the drug company's CMO], that FDA inspectors had observed numerous cGMP failures" supported scienter).

### 3.    Checkpoint's Oversight Of Samsung, In Accordance With Industry Standard Practices

Consistent with the MSA's requirement for close coordination on quality and regulatory matters, at least eight Checkpoint employees in addition to Oliviero had responsibilities relating to cGMP or oversight of Samsung. ¶36. For example, Checkpoint's Senior Quality Assurance Manager was responsible for "overseeing GMP testing at CMO," "developing and maintain relationships with CMO," "CMO/external laboratory oversite [*sic*] to ensure compliance," and "[p]rovid[ing] responses to . . . FDA . . . questions related to QC." ¶36e. The duties of Checkpoint's Sr. Director Operations and Supply Chain included "[l]ead[ing] and manag[ing] relationships with . . . Contract Manufacturing Organizations." ¶36c. The FDA itself "determined that Checkpoint has established quality systems for vendor audits, data verifications, and process review to determine compliance with regulations." ¶37. That Checkpoint employed personnel to oversee Samsung is consistent with industry standard practices. ¶¶53-57; Dkt. 36-3 (expert declaration).

It is also standard for a CMO to notify the drug sponsor of any FDA pre-approval inspection, to jointly prepare for the inspection, to provide daily inspection summaries to the sponsor about potential deficiencies discussed with the FDA, and to provide any Form 483 to the sponsor. ¶57. It is standard for the sponsor's personnel to attend, or at least be available to address the FDA's questions during, any such CMO inspection. *Id.* Samsung followed such practices during a previous FDA pre-approval inspection—spending months preparing with its affected clients, hosting client personnel on-site and providing them with real-time transcription of

15

discussions with the FDA inspectors, incorporating client input into responses to the FDA's questions, and promptly informing the clients of the inspection's end result. ¶¶63-68.

The strongest inference is that Checkpoint's personnel responsible for overseeing Samsung followed such industry standard practices (as contemplated by the MSA), and closely coordinated with Samsung leading up to, during, and after the FDA's pre-approval inspection.

### 4.      Core Operations

The Second Circuit has found support for the argument that "allegations of a company's core operations . . . can provide supplemental support for allegations of scienter." *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 n.3 (2d Cir. 2011). Cosibelimab was Checkpoint's lead product candidate, and the company had no other products near approval (¶¶23, 28-30), so obtaining FDA approval for cosibelimab was Defendants' primary focus. *See Novavax*, 645 F. Supp. 3d at 527-28 (drug company had no approved products, faced financial hardship, and its lead product candidate was "critical to [its] success"); *ImmunityBio*, 2024 WL 3100274, at *11 (defendants "would be involved closely in ensuring compliance with FDA regulations, especially where any violations could postpone the approval of" their lead product candidate).

Further, Samsung was critically important to Checkpoint as cosibelimab's manufacturer. *See Verrica Pharms.*, 2024 WL 150341, at *9 (CEO would know facts relating to cGMP compliance of CMO for key product); *Todd*, 2016 WL 6699284, at *13 ("it would be reasonable for STAAR's top management to closely monitor any possible violations of FDA regulations, particularly after consolidating all manufacturing operations into one facility"); *Mulligan v. Impax Lab'ys, Inc.*, 36 F. Supp. 3d 942, 970 (N.D. Cal. 2014) ("it is absurd to think that the CEO . . . of a pharmaceutical company would be unaware of the . . . non-compliant conditions pervading their company's manufacturing and quality control divisions."). Checkpoint's small size (fewer than 25 employees) also adds to the inference that Oliviero was personally involved in its core operations.

16

*See Todd*, 2016 WL 6699284, at *13 ("It is reasonable to infer that the CEO of . . . a relatively small company with only 335 employees[] would be involved closely in ensuring compliance with FDA regulations, especially where any violations could postpone the approval of [its product]."); *In re Delcath Sys., Inc. Sec. Litig.*, 36 F. Supp. 3d 320, 335 (S.D.N.Y. 2014) (scienter pled where "small company" with 17 to 92 employees "focused on the production of just one product").

### 5. Oliviero's Intentionally Evasive Response

On September 28, 2023, when directly asked by an analyst to "recap the kinds of discussions you've had with the FDA," Oliviero replied in part "[m]ost recently, we had our mid-cycle meeting with the FDA, whereby they conveyed to us that there were no significant issues, no safety concerns thus far with the BLA review, so very clean bill of health *as of that point in time* with the FDA." ¶140-41. Oliviero's attempt to limit his response to exclude FDA actions after the mid-cycle meeting (which occurred by August 14, 2023, *see* ¶162), despite the obvious importance of providing the most current information, gives rise to an inference that he knew of negative developments post-dating the mid-cycle meeting that he wished to conceal, *i.e.* the FDA's issuance of the September 1, 2023 Form 483 to Samsung. *See Verrica Pharms.*, 2024 WL 150341, at *10 (drug company CEO's "evasive phrasing" in response to analyst question about FDA approval process "suggests an awareness that his statements were misleading").

Furthermore, after September 1, 2023, Oliviero *twice* made very similar statements reporting positive developments in the FDA's review of the BLA while omitting the recent Form 483. That he did so first in prepared remarks (*see* Dkt. 39-9 at 2-5), and then again in response to an analyst's question, shows that the omission was intentional, and not due to mere inadvertence. ¶¶137, 141. *See In re Intercept Pharms., Inc. Sec. Litig.*, 2015 WL 915271, at *7 (S.D.N.Y. Mar. 4, 2015) (scienter pled where defendant "chose . . . only to report the positive development, engaging in the sort of selective disclosure that creates a real possibility of misleading investors").

17

### 6.    The Competing Innocent Inference Is Implausible

Defendants would presumably have the Court infer that they only learned of the Form 483 *after* Oliviero's September 11 and September 28, 2023 statements. Based on the above-described allegations it is implausible that Samsung waited over 10 days, let alone four weeks, to disclose the Form 483 to Defendants. Far more compelling is the inference that Samsung disclosed this important information to its client immediately. And while Defendants no doubt *hoped* that the issues noted in the Form 483 would be promptly resolved to the FDA's satisfaction, that hope did not authorize them conceal the Form 483 from investors.[5] Defendants fail to provide any plausible explanation for Oliviero's omission, let alone to establish a *more compelling* innocent inference.

### B.    FDA Actions In October 2023 Informed Defendants Of Even Greater Risks To Cosibelimab's Approval

By the time of Defendants' November 13, 2023 statement of belief that Samsung "will adequately respond to and address the [Form 483] observations during our BLA review timeline" (¶144), Defendants had learned additional facts severely undermining their professed belief. First, in early October 2023 two FDA inspectors classified the pre-approval inspection of Samsung as Official Action Indicated, and recommended to "withhold" BLA approval. ¶¶89-90; Dkt. 36-5. The FDA and Checkpoint were to hold a late-cycle BLA meeting, which was "scheduled for late October." ¶¶50, 138. Before that meeting, the FDA notifies the applicant of any outstanding substantive issues, and the meeting is intended to identify deficiencies. ¶165. Despite publicly touting every positive FDA interaction, Defendants have never disclosed *anything* about what occurred at the late-cycle meeting. That this conspicuous silence came shortly after FDA

---

[5] *See Yanek*, 388 F. Supp. 2d at 1132 ("STAAR may have believed or hoped that the Issues raised in the Form 483 would not pose a serious problem to FDA approval. Nevertheless, Defendants' failure to mention those issues in their statements responding to direct questioning about potential obstacles to FDA approval raises a strong inference that those statements were made with actual knowledge of their falsity.").

inspectors issued withhold recommendations leads to the conclusion that the FDA told Checkpoint during or leading up to the late-cycle meeting that it was considering withholding approval.

Second, the FDA's pre-approval inspection of Samsung also related to Eli Lilly's BLA for its eczema treatment, lebrikizumab. ¶¶84, 91-92. On October 2, 2023, Eli Lilly announced that the FDA issued a CRL rejecting its BLA, which was widely reported. ¶¶92, 94. On December 18, 2023, Defendants issued a press release regarding the FDA's CRL for the cosibelimab BLA, which was based on the Eli Lilly press release, copying portions verbatim. ¶¶95-96; Dkt. 36-8. The most logical inference is that Defendants knew since the multi-sponsor inspection of Samsung that Eli Lilly was also involved (*see* ¶¶57, 63-67), and knew since Eli Lilly's announcement of its CRL that the FDA had rejected a BLA due to Samsung's *same* cGMP violations (*see* ¶¶92-94).

### C. Samsung Biologics Had Notified Defendants Of Its Data Integrity Problems By At Least January 2023

In September 2022, through an audit of Samsung by Eli Lilly and subsequent tour of the MSAT lab by senior Samsung executives, Samsung identified serious data integrity problems. ¶¶87, 91. Samsung notified its clients of these problems "with dates of client notification ranging from 17 October 2022 to 16 January 2023." ¶87; Dkt. 36-4 at 2. These cGMP violations called into question the accuracy of the data generated by Samsung (¶¶42-47), and resulted in an internal investigation and the termination of MSAT lab executives (¶¶82-83, 91). Because the MSAT lab was used in connection with the cosibelimab BLA (*see* ¶90) and cGMP required changes to Samsung's data integrity practices (*see* ¶¶42-47), Samsung was required to notify Checkpoint of these violations (*see* Dkt. 36-2 at §6.2(a)). Therefore, it is reasonable to infer that Samsung notified Checkpoint of the data integrity violations as required, and no later than January 16, 2023.

### D. Defendants Were Consciously Reckless As To The FDA's Repeated Observations Of cGMP Violations At Samsung Biologics

The FDA inspected Samsung Biologics ten times from 2016 to February 2023, each time

19

issuing a Form 483 noting cGMP violations. ¶¶71-81. Defendants either knew of the FDA's observations or were consciously reckless in not knowing about them. Numerous allegations show Checkpoint's close oversight of Samsung's cGMP compliance. *See supra* Part V.A. Under these circumstances, if Defendants did not obtain copies of the Forms 483 that the FDA repeatedly issued to Samsung, then their deliberate failure to do so gives rise to a strong inference of scienter. *Sec. & Exch. Comm'n v. CKB168 Holdings, Ltd.*, 210 F. Supp. 3d 421, 446 (E.D.N.Y. 2016) (scienter may be established by "willful blindness, *i.e.*, a deliberate refusal to acquire information").

E.    **Defendants Had Strong Financial Motives To Conceal Facts That Created Risks To Cosibelimab's Approval And Checkpoint's Stock Price**

"[C]ourts have found allegations of motive adequate where the company[] needed to fundraise to survive." *Skiadas v. Acer Therapeutics Inc.*, 2020 WL 3268495, at *11 (S.D.N.Y. June 16, 2020); *see also Intellipharmaceutics*, 348 F. Supp. 3d at 326 (motive to misrepresent facts about drug application alleged where the complaint "describes [the company's] dependence on sales of its stock to cover its operating losses."). Stock sales by a company are properly considered as part of the holistic scienter inquiry. *See Skiadas v. Acer Therapeutics Inc.*, 2020 WL 4208442, at *5 (S.D.N.Y. July 21, 2020). Checkpoint had little cash and no approved products, its financial statements contained a going concern warning, and it incurred over $50 million in operating expenses per year, so its survival depended on obtaining funding from investors. ¶¶23-27. During the Class Period Checkpoint sold at least $79 million of artificially inflated securities. ¶97. Checkpoint sold $11 million of securities on October 2, 2023, *after* the FDA issued the September 1, 2023 Form 483 and *before* its existence had been disclosed. ¶¶84, 102. Checkpoint badly needed those funds—as of September 30, 2023 it had only $1.8 million of cash left, and had incurred a $7.7 million loss from operations in its most recent quarter. Dkt. 39-11 at pages 6-7 of 69.

Oliviero had personal financial motives to conceal risks to cosibelimab's approval. From

20

2016 when he began publicly reporting his ownership of Checkpoint stock up until the beginning of the Class Period, his only sales were non-discretionary and made to satisfy withholding tax obligations. ¶172. Then, from April 4 to June 23, 2022, Oliviero sold 397,641 shares of Checkpoint stock for $512,644. ¶173. On September 26, 2022 Oliviero transferred 600,000 shares worth $589,800 to his children's trust, bringing his total shares disposed of in 2022 to 997,641, or 34.7% of his pre-April 4, 2022 total, with a disposed value over $1 million. ¶¶173-75.[6] In 2023, Oliviero transferred another 54,510 shares (equivalent to 545,100 shares on a pre-reverse split basis) worth $201,590 to his children's trust (¶175). By transferring stock to an irrevocable trust for which he is not a trustee and disclaims investment authority, Oliviero avoided publicly reporting any sale of the stock by the trust, although trust law requirements for prudent investing and diversification practically ensured that most or all of the Checkpoint stock would promptly be sold. ¶176.

Defendants argue that they had no motive to mislead because investors would inevitably uncover the alleged fraud upon the FDA's rejection of the BLA. But Plaintiffs do not claim that Defendants knew the cosibelimab BLA was doomed to failure, only that it faced heightened risks that Defendants knowingly concealed. The court in *Acer Therapeutics* rejected Defendants' argument, finding the allegations "support the inference that Defendants rationally (though recklessly) gambled that the FDA would ultimately approve [the drug]," while concealing information that created risks to approval. 2020 WL 3268495, at *11; *see also Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) ("The fact that a gamble—concealing

---

[6] The table in ¶173 contains a typo, the number "1,589,003" should be "2,589,003." *See* Spencer Decl. Ex. A. The right-most column in ¶175 is mistakenly labeled "Shares Owned After Transfer." The figures in that column reflect the amounts disclosed in Oliviero's SEC Forms 5 under the heading "Amount of Securities Beneficially Owned at end of Issuer's Fiscal Year." *See* Spencer Decl. Exs. B & C. As such, these forms show that Oliviero owned 196,199 shares at December 31, 2022 (after giving effect to Checkpoint's December 2022 1-for-10 reverse stock split), and 381,580 shares at December 31, 2023. The increase is due to incentive compensation, not purchases. ¶174.

bad news in the hope that it will be overtaken by good news—fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble."). "In short, [plaintiffs] allege[] that Defendants gambled and lost. [Plaintiffs are] not arguing . . . that Defendants knew that the FDA would not approve [their drug]." *Acer Therapeutics*, 2020 WL 4208442, at *8.

Defendants' reliance on this Court's opinion in *Gillis v. QRX Pharma Ltd.*, is misplaced. 197 F. Supp. 3d 557 (S.D.N.Y. 2016). Unlike here, in *Gillis* there was no allegation of any financial motive. *Id.* at 600. What was "illogical" in that case was the theory that the defendants "knew for years, long even before the CRL, that MoxDuo would face a heightened proof hurdle . . . *which it could not clear*." *Id.* Here, Plaintiffs do not argue that Defendants knew the BLA would be rejected.

### F.       Defendants Seek To Impose A Scienter Standard That Is Contrary To Law

Defendants claim that to plead scienter plaintiffs must allege that "management knows that certain facts *will necessarily prevent* the regulatory approval or the marketing of the drug," or that "Defendants believed that the manufacturing issues *could not be resolved* quickly or that the FDA *would not approve* the BLA." MTD at 12. But neither case cited by Defendants in support of that argument purports to impose such categorical requirements. The defendants in *Yanek* similarly argued that "Plaintiffs must show Defendants knew that the FDA would find STAAR's . . . written response inadequate." 388 F. Supp. 2d at 1130. There, the court held "Defendants attempt to raise the standard for scienter far beyond what is required by the PSLRA," and "the PSLRA does not require that Plaintiffs show that Defendants were capable of predicting the future." *Id.* To establish scienter, Plaintiffs need not allege that Defendants knew to a certainty that the cosibelimab BLA would be rejected, merely that the undisclosed adverse facts, "*could* cause problems for the drug's approval and commercial success." *Intercept Pharms.*, 2015 WL 915271, at *9.

Defendants rely on this Court's opinion in *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737 (S.D.N.Y. 2018) to label Plaintiffs' scienter allegations as "conclusory." However,

22

the *Aratana* complaint is readily distinguishable because its scienter allegations largely focused on announcements by defendants postponing an expected product launch, to infer that they should have known of the full delay all along. *See* Case No. 1:17-cv-880 at Dkt. 22 at ¶¶130-40.[7] In stark contrast, Plaintiffs here allege, *inter alia*, that Samsung was contractually required to provide Checkpoint the September 1, 2023 Form 483 and Oliviero admitted that "they share everything with us." ¶¶32j, 157. While these allegations are circumstantial, they are *not* conclusory. It is beyond dispute that plaintiffs may plead scienter through facts "constituting strong *circumstantial evidence* of conscious misbehavior or recklessness." *Setzer*, 968 F.3d at 212. Scienter is often pled based on such allegations, and "direct evidence" of defendants' knowledge is not required. *E.g.*, *Novavax*, 645 F. Supp. 3d at 527; *Impax Lab'ys*, 36 F. Supp. 3d at 969; *see* Fed. R. Civ. P. 9(b) ("intent, knowledge, and other conditions of a person's mind may be alleged generally").

## VI.    DEFENDANTS' FRAUD CAUSED INVESTORS SUBSTANTIAL LOSSES

"A plaintiff may establish loss causation by demonstrating either (1) a corrective disclosure or (2) a materialization of a concealed risk." *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 765 (S.D.N.Y. 2017) (Engelmayer, J.). Loss causation must only be plausibly alleged, to give defendants "some indication" of the causal connection between the misrepresentation and the loss. *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005); *Teligent*, 2020 WL 3268531, at *19.

Defendants repeatedly concealed Samsung's cGMP violations and adverse FDA actions that created foreseeable, heightened risks that the FDA would reject the original cosibelimab BLA. Those risks materialized when Defendants announced that the FDA had issued its CRL due to

---

[7] Defendants' reliance on *Liu v. Intercept Pharms., Inc.*, 2022 WL 2165621 (2d Cir. June 16, 2022) is similarly misplaced. There, "speculative allegations concerning data that Individual Defendants 'must have reviewed'" failed to plead scienter. *Id.* at *3. As the district court in that case held, plaintiffs' scienter theory boiled to the unsupported argument that by virtue of speaking about safety data, defendants "must have reviewed" information that rendered their statements misleading. *Hou Liu v. Intercept Pharms., Inc.*, 2020 WL 5441345, at *5 (S.D.N.Y. Sept. 9, 2020).

"findings that arose during a multi-sponsor inspection of" Samsung. ¶¶151-52. That same day, Checkpoint's stock price fell 44.9%, with independent observers linking the decline to the CRL announcement. ¶¶153-54. Similarly, in *Verrica Pharmaceuticals* the court found loss causation plausibly alleged where defendants concealed cGMP violations by Verrica's CMO that were noted in a Form 483, which resulted in the FDA issuing a CRL to Verrica, causing an 8.3% decline in the company's stock price. 2024 WL 150341, at *3 and *13.

Defendants argue that their generic warning that the FDA might not approve the cosibelimab BLA defeats loss causation, but that truism did nothing to reveal the concealed facts that made the FDA's rejection of the BLA substantially more likely. In *Braskem* this Court similarly rejected the defendants' argument about a generic warning that a pricing agreement could be terminated, because defendants "concealed a fact that made cessation of such pricing *more likely*." 246 F. Supp. 3d at 766. Nor does the FDA posting a redacted version of the September 1, 2023 Form 483 (Dkt. 36-4) to its website on October 17, 2023 defeat loss causation. The version published by the FDA removed identifying information relating to the products and drug sponsors involved, and so it did not inform investors that the Form 483 related to the pre-approval inspection for the cosibelimab BLA. Any investors who might have otherwise *guessed* at such a connection would have been falsely reassured by Oliviero's statements of "no significant [review] issues" on September 11 and September 28, 2023 that the Form 483 did *not* relate to cosibelimab.[8]

## VII.   OLIVIERO IS LIABLE AS CHECKPOINT'S CONTROL PERSON

Oliviero's only argument against Exchange Act § 20(a) liability is that the Complaint does

---

[8] When investors learned of the September 1, 2023 Form 483, or that it related to the cosibelimab BLA, are fact questions appropriately addressed after discovery. *Cf. Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 167 (2d Cir. 2000) ("the corrective information must be conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information . . . The truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality.").

not plead a primary violation of § 10(b). As shown *supra*, that argument fails.

## VIII.    THE AHEARN EXPERT DECLARATION PROVIDES RELIABLE FACTUAL ALLEGATIONS AND SHOULD BE CONSIDERED BY THE COURT

Defendants argue the Court is precluded by a technicality from considering the declaration of Plaintiffs' FDA expert Jennifer Ahearn, however they do not dispute her qualifications or the factual accuracy of her statements. MTD at 22-23. Defendants' cases involved unreliable declarations setting forth disputed facts and conclusory legal opinions, among other defects. Moreover, "none of the cases cited by Defendant make it clear that all attachments to a complaint which are not written instruments are *per se* improper under Rule 12(f) or Rule 10(c)." *Wheeler v. BRAC Int'l*, 2024 WL 4416594, at *4 (S.D.N.Y. Oct. 3, 2024). "Even if the *attachments* themselves are stricken, it is clear that Plaintiff may include *allegations* based on extrinsic evidence." *Id.*; *see also Ong v. Chipotle Mexican Grill*, Inc., 294 F. Supp. 3d 199, 224 (S.D.N.Y. 2018) (denying motion to strike factual allegations that were based on stricken expert declaration).

The Complaint summarizes Ms. Ahearn's declaration, incorporating it by reference. ¶¶53-57; *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016) ("A complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference"). Courts routinely consider similar allegations. *See In re Platinum & Palladium Antitrust Litig.*, 2017 WL 1169626, at *13 (S.D.N.Y. Mar. 28, 2017) ("The Second Circuit and district courts in this circuit routinely rely on expert and statistical analyses contained in pleadings"); *Iron Workers Loc. 580 Joint Funds v. Nvidia Corp.*, 2020 WL 1244936, at *7 (N.D. Cal. Mar. 16, 2020) ("There is authority for the proposition that a plaintiff in a securities fraud action . . . can support its allegations of falsity with facts provided by an expert").

## IX.    CONCLUSION

Plaintiffs respectfully request that the Court deny Defendants' motion.

DATED: December 23, 2024

**GLANCY PRONGAY & MURRAY LLP**

By:  */s/ Garth Spencer*
Garth Spencer (GS-7623)
Robert V. Prongay
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: gspencer@glancylaw.com
         rprongay@glancylaw.com

Gregory B. Linkh (GL-0477)
230 Park Ave., Suite 358
New York, NY 10169
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
Email: glinkh@glancylaw.com

*Lead Counsel for Lead Plaintiff Hamilton Bailey*
*and Named Plaintiff Reiko Juhst*

26

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On December 23, 2024, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on December 23, 2024.


*s/ Garth Spencer*
Garth Spencer